# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| FIRTIVA CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:21-cv-00111-JRG-RSP |
| | § | |
| FUNIMATION GLOBAL GROUP, LLC, | § | |
| | § | |
| *Defendant*. | § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is the opening claim construction brief of Plaintiff Firtiva Corporation (Dkt. No. 44, filed on October 22, 2021), Defendant Funimation Global Group, LLC's response (Dkt. No. 47, filed on November 5, 2021), and Plaintiff's reply (Dkt. No. 50, filed on November 12, 2021).  The Court held a claim construction hearing on December 3, 2021.

Plaintiff alleges Defendant infringes certain claims from U.S. Patent 10,116,999. The parties dispute the scope of eight claim terms or phrases. First, Defendant contends that all claims, because of disavowal, require that enticements be received or transmitted only after a broadcast is complete. Second, Defendant contends "user information" is indefinite, although it proposes a construction in the alternative. For the other six terms, Defendant advances a specific construction. For all of the terms, Plaintiff contends a construction of "plain and ordinary meaning" is appropriate.

Having considered the parties' briefing, along with argument presented by the parties at a December 3, 2021 hearing, the Court issues the following constructions and Order.

**I.     BACKGROUND**

The '999 Patent, which has an effective filing date of January 2001, concerns systems and methods for allowing content to be broadcast without commercial interruption. '999 Patent at (57). The patent explains how increasing production costs result in content providers increasing the number of commercials during broadcasts. Commercial interruptions break up the shows, make the viewing experience less enjoyable, and result in more competition from paid content providers. This, says the patent, prevented television viewing from reaching its full potential as of the effective filing date. *See generally* '999 Patent at 1:16–37.

To address this problem, the '999 Patent teaches methods and systems for allowing companies to sponsor broadcasts while avoiding commercial interruptions. "The amount of time a viewer spends watching a particular broadcast is recorded along with information about the sponsoring companies or organizations for the broadcast." *Id.* at (57). "The viewer later accesses a central database, which sends back to the viewer advertisements, coupons, discounts, contests, and other enticements to purchase products, based on the amount of time the viewer spent watching broadcasts or segments of broadcasts that were sponsored by the advertiser." *Id.*

The '999 Patent includes both method and system claims. Claim 1 is representative of the method claims:

> 1. A computer-implemented method comprising:
>
>    receiving a transmission of a broadcast, the transmission including embedded information and content, the embedded information including data associated with the content, the data comprising at least one of a TV channel, content name, timestamp, time slice, and sponsor identification;
>
>    determining if there is any embedded information in the broadcast;

> extracting the content from the broadcast by use of a decoder to split the extracted content from the embedded information, the embedded information being one or more data packets inserted in the broadcast with a frame of content;
>
> sending the extracted content to a display;
>
> examining the embedded information for an end-of-slice marker that signals the end of a time slice;
>
> maintaining viewing counters to keep track of how much time a viewer spent viewing the content corresponding to the time slice; recording the viewing counters as viewing information when the end of a time slice is detected, the time slice corresponding to the sponsor identification;
>
> storing the embedded information on a storage device of a computer;
>
> transmitting a user identifier and the viewing information to a remote server; and
>
> receiving an enticement based on the embedded information, the viewing information, user information retrieved based on the user identifier, and a sponsor of the time slice corresponding to the sponsor identification.

'999 Patent at 7:16–47; *see also id.* at 8:56–9:15 (Claim 18). Claim 10 is directed to a computer with

> a receiver configured to receive a transmission of a broadcast, the transmission including embedded information and content, the embedded information including data associated with the content, the data comprising at least one of a TV channel, content name, timestamp, time slice, and sponsor identification, the receiver being further configured to determine if there is any embedded information in the broadcast, to extract the content from the broadcast by use of a decoder to split the extracted content from the embedded information, the embedded information being one or more data packets inserted in the broadcast with a frame of content, and to send the extracted content to a display, the receiver being further configured to examine

3

>   >   the embedded information for an end-of-slice marker that signals the end of a time slice, to maintain viewing counters to keep track of how much time a viewer spent viewing the content corresponding to the time slice, and to record the viewing counters as viewing information when the end of a time slice is detected, the time slice corresponding to the sponsor identification;
>   >
>   > a storage device for storing the embedded information;
>   >
>   > a transmitter configured to transmit a user identifier and the viewing information to a remote server; and
>   >
>   > the receiver further configured to receive an enticement based the embedded information, the viewing information, user information retrieved based on the user identifier, and a sponsor of the time slice corresponding to the sponsor identification.

*Id.* at 8:4–35; *see also id.* at 9:40–10:22 (Claim 27).

## II.     LEGAL STANDARDS

### A.     Generally

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure-Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to

explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean[,] [including] the words of the claims themselves,

5

the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116).

### B.     Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "A patent must be precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id.* at 908–09. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III.    THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, the parties generally agree on the appropriate level of ordinary skill in the art at the time of invention. Plaintiff's expert asserts a skilled artisan would have had "at least a Bachelor's degree in electrical engineering, computer engineering, or a related field, with two (or more) years of experience in computer networks, network communications, telecommunications, or

network systems." Lavian Decl., Dkt. No. 44-5 ¶ 24. Similarly, Defendant's expert contends a skilled artisan "would have had a bachelor's or graduate degree in computer science, computer or electrical engineering, or a related field of study, with knowledge of networks and streaming media." Goldberg Decl., Dkt. No. 47-5 ¶ 21. To the extent there are differences between these proffered levels of skill, neither party asserts the proper construction of terms requires resolving those differences.

## IV.  THE DISPUTED TERMS

### A.  "receiving an enticement . . ." and "transmitting the enticement . . ." (Claims 1, 10, 18, and 27)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| plain and ordinary meaning | The claims require that any enticement may only be received or transmitted after the broadcast so that the broadcast is not interrupted. |

The claims require either receiving or transmitting an "enticement." '999 Patent at 7:43–47 (reciting, in Claim 1, the step of "receiving an enticement based on the embedded information"); *id.* at 8:31–35 (requiring, in Claim 10, a receiver "configured to receive an enticement based on the embedded information"); *id.* at 9:13–15 (reciting, in Claim 18, the step of "transmitting the enticement"); *id.* at 10:16–22 (requiring, in Claim 27, a controller configured "to search a database for an enticement" and "to transmit the enticement").

Arguing "[c]lear, unmistakable, and exacting disavowal," Defendant contends the claims require that any enticement may only be received or transmitted after the broadcast so that the broadcast is not interrupted. Dkt. No. 47 at 11. Defendant asserts express disavowal is found in the Abstract and the Summary, and that the Background repeatedly disparages the prior art of

7

providing ads or commercials that interrupt broadcasts. *Id.* at 11–13. Defendant also cites letters from the inventor and a 2014 press release. *Id.* at 16–17.

The standard for finding disavowal is "exacting." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). "'Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.'" *Id.* (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)). "'The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Id.* (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). But "[a]bsent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.,* 381 F.3d 1352, 1358 (Fed. Cir. 2004).

Here, the Court does not find disavowal, in part because nothing in the specification expressly says that the enticements cannot be viewed while the broadcast is ongoing. Instead, the patent explains the invention "allows content to be broadcast without commercial interruption, yet lets the company or companies that sponsor the broadcast to offer advertisements and discounts and various special offers *to the viewers at a later time of their own choosing*." '999 Patent at 1:51–55 (emphasis added). But "at a later time" relative to what?

According to the Summary, "at a later time" is relative not to the completion of the broadcast, but to the invention placing or updating a cookie on the viewer's television hard drive:

> At various regular intervals . . . HTTP protocol communications from a Web server are sent to the television, which places a cookie or updates an existing cookie on the television hard drive. . . . *At a later time, of the viewer's choosing*, the viewer can use the Internet connected television to connect to a website. . . . [T]he website examines the cookie and retrieves the information in it. Each sponsor can then offer advertisements, coupons, discounts, and other enticements to purchase goods based on the amount of time the viewer spent watching a sponsored broadcast.

*Id.* at 2:7–23 (emphasis added); *see also id.* at 2:47–55. Alternatively, "at a later time" is relative to the invention sending data to a centralized database that contains information about the show and the user:

> At various regular intervals . . . data is sent to a centralized database for the network or the sponsor or a clearinghouse for coupons. The data contain information including the time of day, the television channel, the name of the television show, and each sponsor of the show. The data also contain a user identifier such as a name, user ID, or television serial number. *At a later time, of the viewer's choosing,* the viewer can use the Internet connected television to connect to a website that has access to the central database. This website can belong to the television network or a particular sponsor or a central clearing house for coupons. When connecting to the website, using the standard HTTP protocol, the user identifier is sent to the website which then examines the central database and retrieves the information in it for this particular user. Each sponsor can then offer advertisements, coupons, discounts, and other enticements to purchase goods based on the amount of time the viewer spent watching a sponsored broadcast.

*Id.* at 2:25–36; *see also id.* at 2:65–3:7 (similar). This makes sense, because the patent addresses the problem of commercial interruptions *by the broadcaster*, and says nothing about voluntary interruption by the user, such as if the user is no longer interested in the broadcast.

Defendant's "disparagement" argument supports this conclusion. Specifically, Defendant cites language from the patent that explains the corporations, not the viewer, interrupt the broadcasts at regular intervals. Dkt. No. at 11 (citing '999 Patent at 1:19–20). The first sentence

9

of the Summary, on which Defendant relies, then explains, "The present invention allows [but does not require] content to be broadcast without commercial[s] [by the broadcaster], yet lets the company or companies that sponsor the broadcast . . . offer advertisements and discounts and various special offers to the viewers at a later time of their own choosing." '999 Patent at 1:48–55. Thus, if anything, the patent disparages allowing the *broadcaster* to interrupt the broadcast, not viewers' ability to receive enticements when they wish, even while the broadcast is ongoing.[1] Yet disavowal as urged by Defendant would foreclose that option.

Defendant has not shown clear and unmistakable disavowal that limits the receiving and transmitting of enticements until after the broadcast. Accordingly, the Court rejects Defendant's proposed construction and will give this term its plain and ordinary meaning.

B.      "user information" (Claims 1, 10, 18, and 27)

| **Plaintiff's Construction** | **Defendant's Construction** |
|---|---|
| Not indefinite. | Indefinite. Alternatively, "information for a particular user." |

According to the claims, "user information" is part of the basis by which "enticements" are chosen. '999 Patent at 7:43–47 (reciting, in Claim 1, the step of "receiving an enticement based on . . . user information retrieved based on the user identifier"); *see also id.* at 8:31–35 (requiring, in Claim 10, a receiver "configured to receive an enticement based [on] user information retrieved based on the user identifier"); *id.* at 9:8–12 (reciting, in Claim 18, the steps of "retrieving user information associated with [a received] user identifier" and "searching a database for an enticement based on the user information"); *id.* at 10:12–18 (requiring, in

---

[1] Also, the steps of "receiving" and "transmitting" enticements do not inherently require interrupting a broadcast. Nothing in patent suggests enticements cannot be received or transmitted during the broadcast and then viewed or accessed later.

Claim 27, "a receiver configured to receive, from a device, a user identifier" and "a controller configured to retrieve user information associated with the user identifier").

Defendant contends this term is indefinite because it "is not explained, defined or discussed anywhere in the '999 Patent." Dkt. No. 47 at 17. According to Defendant's expert, by using this term in the claims, the patent "fails to inform a POSITA of the scope of the invention with reasonable certainty." Dkt. No. 47 at 17 (citing Goldberg Decl., Dkt. No. 47-5 ¶¶ 26–30).

Defendant must show indefiniteness by clear and convincing evidence, *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017), but does not carry that burden here. For one, Defendant confuses breadth with indefiniteness by asserting the patent must specifically identify what composes the "user information." Instead, the question is whether a skilled artisan would understand the scope of the claim with reasonable certainty. *See Nautilus, Inc.*, 572 U.S. at 901 ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

Here, Defendant has not offered convincing argument or evidence on that question. Defendant primarily relies on its expert's declaration, which is conclusory and not persuasive. He spends a number of paragraphs reciting what various documents, including the patent, say (and don't say) about the term, but provides scant reasoning for his conclusions. *See, e.g.*, Goldberg Decl., Dkt. No. 47-5 ¶¶ 28 (noting the specification does not define or explain "user information" "in any clear or reasonably certain way"), 30 (noting "'user information' does not appear in the specification of the '999 Patent, nor does it appear in the original claims or original specification"). Nowhere, however, does he explain specifically why a skilled artisan, as he defines one, would have difficulty with this phrase.

That said, Defendant's alternative construction of "information for a particular user" is generally appropriate. Plaintiff contends it adds needless complexity to a straight-forward and well-understood term, Dkt. No. 44 at 11 n.4, but offers no meaningful resistance to this construction. Plaintiff, however, has established that "user information" relates to a particular user. *See generally id.* at 13–21. Accordingly, the Court construes "user information" as "information relating to a particular user."

C. **"the data comprising at least one of a TV channel, content name, timestamp, time slice, and sponsor identification" (Claims 1, 10, 18, and 27)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | The data must include at least one of all listed items, namely the data must include at least one TV channel, at least one content name, at least one timestamp, at least one time slice, and at least one sponsor identification. |

Defendant relies on *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870 (Fed. Cir. 2004) for its proposed construction of this term. In *SuperGuide*, the disputed claim language recited "first means for storing *at least one of* a desired program start time, a desired program end time, a desired program service, *and* a desired program type." *SuperGuide*, 358 F3d at 884 (emphasis in original). Because "at least one of" preceded a series of broad categories of criteria, the court concluded "the patentee used the term 'and' to separate the categories of criteria, which connotes a conjunctive list." *Id.* at 886. Treating this grammatical principle as a rebuttable presumption, the court also noted that "[e]very disclosed embodiment taught that the user must choose a value for each designated category." *Id.* at 887.

*Superguide* is context specific, and other courts have found it inapplicable when the facts so require. *See Iridescent Networks, Inc. v. AT&T Mobility, LLC*, No. 6:16-CV-01003, 2017 WL

10185852, at *3–*4 (E.D. Tex. Dec. 1, 2017) ("Defendants' objection based upon *SuperGuide* suggests that *SuperGuide* created a universal rule for all claims that use the phrase "at least one of" and should be applied irrespective of the disclosures in the specification. This is not the holding of *SuperGuide*, and indeed, several other courts have applied the same reasoning as the Magistrate Judge"); *see also Fiber, LLC v. Ciena Corp.*, No. 13-CV-00840-PAB-KLM, 2017 WL 3896443, at *8 (D. Colo. Sept. 6, 2017); *TQ Delta, LLC v. Comcast Cable Commc'ns, LLC*, No. 1:15-CV-00611-RGA, 2016 WL 7013481, at *8 (D. Del. Nov. 30, 2016)*; Fujifilm Corp. v. Motorola Mobility LLC,* No. 12-CV-03587-WHO, 2015 WL 1265009, at *8 (N.D. Cal. Mar. 19, 2015) ("*SuperGuide* did not erect a universal rule of construction for all uses of 'at least one of' in all patents . . . [t]he *SuperGuide* court's construction of 'at least [one] of' was based on the particular facts of the particular patent at issue there.").

Here, unlike the patent in *SuperGuide*, the '999 Patent provides examples in which not all of the recited "categories" are required. As noted by Defendant, column 2, lines 28–30 omits "time slice" data. Dkt. No. 47 at 24–25.[2] Elsewhere, as noted by Plaintiff, the embodiment shown in Fig. 4 and described in column 5, lines 29–41 does not include a "TV channel." *See also* '999 Patent at 2:67–3:3 ("The data contain information including the time of day, the website that is the source of the broadcast, the name of the broadcast content, and each sponsor of the show."). This is not surprising, as a TV channel would not be required if the content comes from a website rather than a television-based source.[3] So, unlike *SuperGuide*, at least two disclosed embodiments do not require all of the information types listed in this term.

---

[2] Defendant explains away this omission because "time slice" is expressly recited elsewhere in each of the independent claims and is therefore "obviously required." Dkt. No. 47 at 24–25. But the question before the Court is the scope of *this* phrase, not whether other parts of the claim require a "time slice."

[3] The patent discloses four embodiments. In two of those, "the user watches an Internet connected television." *Id.* at 2:6–7; *see also id.* at 2:24–25. In the other two embodiments, "the user watches a streaming media broadcast from a Web server on a computer." *Id.* at 2:45–47; *see also id.* at 2:63–65.

13

In addition, the series of categories at issue in *SuperGuide* is of a different nature than the data here. *SuperGuide* concerned broad categories of search or selection criteria. *See Superguide*, 358 F.3d at 873. The technology at issue concerned "interactive program guides" that allowed users to search information about upcoming programs based on the criteria. *Id.* (explaining that, prior to the teachings of the patent at issue, "viewers could not perform a search" of "television schedule information for upcoming programs"). In contrast, here the data is not "criteria" for anything. Rather, the data reflects the result of the viewer's prior selection of content to be watched.

For these reasons, the Court rejects *SuperGuide*'s applicability to these facts, concludes the disputed phrase is disjunctive, and construes the phrase as ""data comprising one or more of a TV channel, a content name, a timestamp, a time slice, or a sponsor identification."

**D.     "user identifier" (Claims 1, 10, 18, 27)**

| **Plaintiff's Construction** | **Defendant's Construction** |
|---|---|
| Plain and ordinary meaning | data used to identify a particular user |

The parties dispute whether the "user identifier" must be associated with a particular user. Plaintiff acknowledges a "user identifier" *could* be used to identify a particular user, but contends the term is not so limiting. Dkt. No. 44 at 23. Plaintiff, however, does not cite intrinsic or extrinsic evidence in support of its position. *Id.*

Other than the claims, the '999 Patent only refers to "user identifier" in the Summary:

> At various regular intervals . . . data is sent to a centralized database for the network or the sponsor or a clearinghouse for coupons. . . . The data also contain a *user identifier* such as a name, user ID, or television serial number. At a later time, of the viewer's choosing, the viewer can use the Internet connected television to connect to a website that has access to the central database. . . . [T]he *user identifier* is sent to the website which then examines the central database and

14

> *retrieves the information in it for this particular user*. Each sponsor can then offer advertisements, coupons, discounts, and other enticements to purchase goods based on the amount of time the viewer spent watching a sponsored broadcast.

'999 Patent at 2:24–44 (emphasis added); *see also id.* at 3:3–16 (similar).

Notably, each of the types of user identifiers named by the specification—name, user ID, and television serial number—suggests one person or device. And the Summary specifies the user identifier facilitates retrieving information for a "particular user." Given the lack of reference in the patent to the identifier being used for multiple users, the Court construes "user identifier" as "data identifying a particular user."

E.   **"sponsor identification" (Claims 1, 10, 18, 27)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | data that identifies a sponsor of a time slice |

This dispute concerns whether an identified sponsor must be associated with a time slice. According to Plaintiff, "while a sponsor identification can be associated with a time slice, nothing in the specification requires this." Dkt. No. 44 at 23. Plaintiff stresses the specification is "replete" with references to the term that do not require the data to identify a sponsor of a time slice. *Id.* (citing '999 Patent at 2:7–23, 2:25–44, 4:2–8, 4:11–15). Defendant, in turn, cites the specific embodiments shown in Fig. 4 and Fig. 6, and notes the claims relate the time slice to the sponsor identification. Dkt. No. 47 at 27.

Defendant's arguments are unpersuasive. For one, nothing in the specification limits the meaning of the term to only a sponsor associated with a specific time slice. Additionally, the parties have not asked the Court to construe the claimed relationship between "time slice" and "sponsor identification," but rather only to construe the meaning of the latter to a skilled artisan. Accordingly, the Court rejects Defendant's construction and will give this term its plain and

15

ordinary meaning.

F.     "time slice" (Claims 1, 10. 18. 27)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | a portion of time of a complete broadcast (e.g., a 15-minute interval of a one-hour show) |

The parties dispute whether "time slice" can include an entire broadcast. *See* Dkt. No. 50 at 12 (agreeing "the 'time slice' can be 15 minutes of a one hour broadcast as Defendant suggests," but asserting "a time slice could be for an entire broadcast"). The plain meaning of "slice" suggests part of the whole. Indeed, to "slice" something means to separate it into parts or shares. *See id*. This commonly understood definition is consistent with how the '999 Patent uses the term. *See* '999 Patent at 5:60–6:4 (explaining "time slices may, for example, be 15-minute intervals so that there are 4 slices in a one-hour broadcast"). Moreover, this definition is consistent with the purpose of the invention, which is to allow viewers to watch the broadcast without interruption by commercials between the various "slices" of content. The Court therefore construes "time slice" as "portion of a broadcast" and notes that, contrary to Plaintiff's assertion, a "time slice" cannot be the complete broadcast.

G.     "end-of-slice marker that signals the end of a time slice" (Claims 1, 10. 18. 27)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | flag that signals the end of a time slice |

As support for its construction, Defendant relies on Fig. 4, which shows an embodiment of embedded sponsor information as a stream of data. The packet includes a "head" field, which can be a start-of-slice flag or and end-of-slice flag, and which signals the start or end of a time slice respectively. '999 Patent at 5:29–36. Plaintiff, however, accuses Defendant of trying to

16

swap "flag" for "marker." Dkt. No. 44 at 24–25.

The patent uses "marker" when describing Fig. 7, which shows a general algorithm rather than a specific software implementation of that algorithm. Here, Defendant has not shown that a skilled artisan would understand "marker" to mean only a "flag." There has not been any persuasive reason or argument presented that supports Defendant's proposed construction. The Court will therefore give this term its plain and ordinary meaning.

**H.    "enticement" (Claims 1, 10. 18. 27)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | advertisement, coupon, discount, contest, or other inducement |

Neither party argues this term has a meaning to a skilled artisan different from its meaning to a layperson, and Defendant does not provide a persuasive reason for why this term should be construed. Rather, Defendant seeks to substitute one word not in the patent—"inducement"—for one that appears frequently—"enticement." The Court declines to do so and will give this term its plain and ordinary meaning.

**V.    CONCLUSION**

| Disputed Phrase (Claims 1, 10, 18, 27) | The Court's Construction |
|---|---|
| "receiving an enticement . . ." and "transmitting the enticement . . ." | Plain and ordinary meaning. |
| "user information" | "information relating to a particular user" |
| "data comprising at least one of a TV channel, content name, timestamp, time slice, and sponsor identification" | "data comprising one or more of a TV channel, a content name, a timestamp, a time slice, or a sponsor identification" |
| "user identifier" | "data identifying a particular user" |

| | |
|---|---|
| "sponsor identification" | Plain and ordinary meaning. |
| "time slice" | "portion of a broadcast" |
| "end-of-slice marker that signals the end of a time slice" | Plain and ordinary meaning. |
| "enticement" | Plain and ordinary meaning. |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 3rd day of January, 2022.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE